NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

TYEE MARTELE SPIKE,                    )
                                       )
          Appellant,                   )
                                       )
v.                                     )    Case No.  2D15-4825
                                       )
STATE OF FLORIDA,                      )
                                       )
          Appellee.                    )
_____)

Opinion filed July 27, 2018.

Appeal from the Circuit Court for
Hillsborough County; Kimberly K.
Fernandez, Judge.

Howard L. Dimmig, II, Public Defender,
Brian Lydic, Special Assistant Public
Defender and Lisa Lott, Public Defender,
Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Peter Koclanes, Assistant
Attorney General, Tampa, for Appellee.


BADALAMENTI, Judge.

Tyee Martele Spike appeals his jury convictions and sentences for

trafficking in oxycodone; possession of cocaine with intent to sell or deliver within 1000

feet of a school; possession of marijuana with intent to sell, manufacture, or deliver

within 1000 feet of a school; and possession of drug paraphernalia.  Spike argues that

the trial court abused its discretion in denying his motions for mistrial based on a police detective's testimony that after working for twelve or thirteen years in the area where Spike resided and was arrested, he was familiar with the area in general and knew Spike and "a lot of residents" in that area. We affirm Spike's convictions, concluding beyond a reasonable doubt that the detective's testimony did not affect the jury's verdict and thus any error was harmless.

The drug charges against Spike arose after police searched his home pursuant to a valid search warrant. Spike was not at home during the search, but police located him and brought him back to the residence. The State asked a detective, a member of the search warrant team assigned to secure the perimeter of the residence during the search, the following questions on direct examination:[1]

Q: Was the defendant located inside of that house at that point in time?

A: No, he was not.

Q: What happened after that?

A: I decided to look around in that I knew him. I decided to look around the neighborhood and see if I could locate him.

Q: And were you able to locate him?

---

[1]The dissent notes that "the State's sole purpose for calling the detective to the stand was to identify Spike based on his prior police work." We disagree. A review of the trial transcript reveals that the detective was a member of the search warrant team tasked, along with others, with securing the perimeter of the residence to be searched "in case somebody attempt[ed] to run" from the residence and assisting, if necessary, the officers inside the residence. The detective participated in, among other duties, briefing with the other members of the search warrant team prior to the warrant's execution, assisting other officers to detain Spike and transport him back to his residence, opening a safe containing drugs after Spike had provided the combination to the safe to another officer, and collecting, marking, and testing the evidence seized pursuant to the search warrant.

A: I was.

Q: Where were you able to locate him in relation to the house?

A: It was about three blocks to the south on 15th Avenue.

Q: When you located him, what did you do?

A: Another unit came by and they transported him back to the residence.

Q: You said that you went to go locate the defendant because you knew him.

A: Yes.

Q: Had you met him before?

(Emphasis added.)

At that point, the defense objected and moved for a mistrial, arguing that the testimony implied that the defendant had been involved in past criminal activity. The trial court sustained the objection, observing: "Enough. It was really an unnecessary question. It just was. You know, I went, got him, brought him back to the residence; that's it, period. It was just not a necessary question." The court then denied Spike's motion for mistrial and allowed the State to work to cure the error by eliciting testimony from the detective that he had been working in the community for twelve years and was familiar with the residents. The State resumed its direct examination by asking:

Q: Detective, let's pick up where we left off. How do you know the defendant in the area?

A: I worked that area for about 12 of the 13 years I've been with the Tampa Police Department.
. . . .

Q: How familiar are you with the residents in that area that you worked for 13 years?

A: I'm familiar with the area in general and with a lot of the residents that reside in that area.

The defense renewed its objection and again moved for mistrial. The court again denied the motion.

Under certain circumstances, a police officer's testimony about how the officer came to know a defendant may create a prejudicial inference that the defendant has a prior criminal history. See, e.g., Day v. State, 105 So. 3d 1284, 1286-88 (Fla. 2d DCA 2013) (holding that the trial testimony of detective, who was not otherwise involved in the investigation but to identify defendant in a surveillance video, was not harmless where detective testified that she was a police detective, that she "had contact with" the defendant as a community police officer at a public housing project, that she helped with calls for police assistance, and that through "research and pulling up photos" she learned defendant's real name because she had previously known defendant only by a "street name"). The circumstances in Spike's case, however, were significantly different and any error arising from the detective's testimony about how he knew Spike was harmless beyond a reasonable doubt.

Under the harmless error test, "[t]he question is whether there is a reasonable possibility that the error affected the verdict." State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). DiGuilio informs us that the harmless error test requires both "a close examination of the permissible evidence on which the jury could have legitimately relied" as well as "an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." Id. at 1138.

The evidence against Spike on which the jury could have legitimately relied was significant and included his own admissions to prior criminal activity. Upon

- 4 -

execution of the warrant to search Spike's residence, officers located a bedroom where male clothes were stored and pictures of Spike and his girlfriend were displayed. Spike later admitted in one of his two post-Miranda[2] statements that the bedroom was indeed his. A digital scale used to weigh narcotics and containing cocaine residue was found atop a dresser in that room. A locked, digital safe, which Spike later admitted was his and "nobody else's," was found inside that dresser. While the detective was attempting to unlock the safe with the digital code Spike had provided him, Spike stated to him that there were "only pills and spice in the safe." But crack cocaine, powder cocaine, and oxycodone pills stored in a bottle without a prescription label were also found inside the safe. A law enforcement expert in drug crimes testified that the cocaine was packaged in a manner consistent with the sale of narcotics.

Spike ultimately admitted to officers that he sold cocaine "to make ends meet" because he "was having a hard time paying the bills." But he claimed that the oxycodone pills stored in his locked safe were not his, telling officers that he was "holding them for a friend named Al." As for the marijuana ("spice") found in Spike's safe, Spike told the officers that it was "for his personal use only, not for sale."

In arriving at its guilty verdict, the jury necessarily weighed the strength of the State's permissible evidence, including Spike's admissions. Spike acknowledged selling cocaine and using marijuana. And while Spike told the detective that there were only pills and marijuana in the safe, crack cocaine and powder cocaine were also found in the safe. Spike later admitted that the safe belonged to him and "only him." Thus, while the detective's testimony established that he had worked in the area where Spike

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

lived and that he knew Spike and many area residents, the jury also knew Spike had been engaged in criminal activity based on his own admissions. Accordingly, the effect of any inference that the jury might have drawn from the detective's testimony that he knew Spike from the area was harmless beyond a reasonable doubt.

We recognize that DiGuilio cautions that the harmless error test "is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test" and that instead the "focus is on the effect of the error on the trier-of-fact." 491 So. 2d at 1139. But under the specific circumstances of this case, the effect of the detective's testimony as to knowing Spike from the area was negligible.

To discern the effect of the purported error on the jury here, it is helpful to set forth the context in which the detective's comments were made to the jury and to further note that the detective's testimony was not emphasized by the State at any other point in the jury trial, including the State's closing arguments. Prior to the detective's testimony that he knew Spike, the jury was presented with testimony painting a picture as to the events resulting in Spike's arrest as follows: Specifically, during the execution of the search warrant for Spike's residence by the Tampa Police Department, the detective was assigned to secure the exterior perimeter of the home "in case somebody attempts to run." At approximately 6:15 p.m. on the day of the search, the detective learned from officers securing the inside of the residence that Spike was not inside. The detective explained that at that point "I decided to look around in that I knew him. I decided to look around the neighborhood and see if I could locate him." (Emphasis added.) The detective then explained that he located Spike three blocks south of the residence. The statement of the detective's knowledge of Spike was made in passing.

- 6 -

And although the State asked the detective if he had met Spike before, the detective never answered the question. After denying Spike's motion for mistrial, the detective clarified to the jury that he had worked in that area for twelve or thirteen years and knew how to locate Spike because he was "familiar with the area in general and with a lot of the residents that reside in that area."

Although we share the trial court's observation that some of the State's questioning was unnecessary, we are satisfied that the detective's testimony as to knowing Spike did not affect the verdict under the facts and circumstances here. First, a police officer being "familiar with" a resident of an area where the officer works does not, by itself, reasonably imply a prior bad act by that person. See Harrison v. State, 775 So. 2d 423, 425 (Fla. 5th DCA 2001) (holding, in a robbery case, that testimony that a deputy had run a criminal history check of the defendant and that he had become "very familiar" with the defendant's vehicle because he "had seen that vehicle before" did not create reversible error because it "did not reference any prior criminal history or law enforcement contact"); see also Miller v. State, 605 So. 2d 492, 494 (Fla. 3d DCA 1992) (holding, in a case where the defendant shot and murdered a victim, that a witness's reference to the defendant's "previous dealings" with guns "cannot be said to imply collateral bad acts . . . since there is no indication that the 'previous dealings' were illegal" in any way).

Next, the detective's testimony that he knew Spike did not become a "feature of the trial." See Wright v. State, 19 So. 3d 277, 293-94 (Fla. 2009). The detective's discussion of how he knew Spike, as well as "a lot of the residents that reside in that area," was brief, and the State did not reference Spike's past criminality or contact with police officers in its closing argument. Cf. Fitzsimmons v. State, 935 So. 2d

125, 129 (Fla. 2d DCA 2006) ("The inadmissible collateral crime evidence became a feature of the trial because of the number of witnesses who testified about it and because of the prosecutor's repeated references to it during her closing argument."). Furthermore, the State's case against Spike did not hinge on Spike being "known" by the detective. Cf. Gray v. State, 873 So. 2d 374, 377 (Fla. 2d DCA 2004) ("Generally, when the identification of the defendant as a perpetrator rests on the testimony of a single witness . . . the erroneous admission of collateral crime evidence has not been considered harmless error.").

Even further, the detective's testimony in this case is far less troubling than in those cases where Florida courts have held an officer's testimony about prior contacts with the defendant to be harmful. Those cases either had testimony from police officers who were not involved in the case except to identify the defendant, had testimony that was far more indicative of prior bad acts, or involved other errors unrelated to testimony by police officers. See Day, 105 So. 3d at 1286-88 (concluding that the court committed reversible error by permitting the State to elicit evidence of the witness's status as a police officer where the witness's only role in the investigation was to identify defendant in a surveillance video and the witness testified that she "had contact with" the defendant as a community police officer at a public housing project, that she helped with calls for police assistance, and that through "research and pulling up photos" she learned defendant's real name because she had previously known defendant only by a "street name"); Alcantar v. State, 987 So. 2d 822, 824-25 (Fla. 2d DCA 2008) (holding that an officer who monitored an audio transmission of a controlled drug buy but did not witness it should not have been allowed to testify that he knew the defendant for "all" of his twenty-three-year career and knew the defendant's street

name); State v. Price, 701 So. 2d 1204, 1205-07 (Fla. 3d DCA 1997) (upholding trial court's grant of new trial where police officer, who "was not directly involved in the instant case" and whose "sole purpose was to provide his opinion as to the identification of the Defendant" after having reviewed a videotape of a drug buy, testified while wearing a uniform that he knew "a lot of the residents" in a year and a half of working in a particular area in which defendant did not even reside and explained both that he knew the defendant much longer—"for probably five, six years"—and that he knew the defendant, "Samuel Price," by the nickname "Sammie"); Willis v. State, 669 So. 2d 1090, 1093-94 (Fla. 3d DCA 1996) (finding that errors in a "close" case were not harmless where the State gave improper closing argument attacking the credibility of an alibi witness and where defendant "was unduly prejudiced by the police officer's gratuitous testimony that [defendant] had previous contacts with the police in other 'incidents' "); Edwards v. State, 583 So. 2d 740, 741 (Fla. 1st DCA 1991) (holding that an officer should not have been allowed to testify that he identified the defendant from a video of a controlled drug buy where it was not established that the officer had any knowledge or familiarity with defendant prior to the controlled buy); Hardie v. State, 513 So. 2d 791, 792-94 (Fla. 4th DCA 1987) (holding that it was error to allow five police officers who identified defendant in video surveillance to testify that they were acquainted with the defendant in a smash-and-grab robbery case based on the defendant having been involved in prior "investigations").

Accordingly, after "a close examination of the permissible evidence on which the jury could have legitimately relied" as well as "an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict," DiGuilio, 491 So. 2d at 1138, we conclude beyond a reasonable doubt that the

- 9 -

detective's testimony did not affect the jury's verdict and thus any error was harmless.

We therefore affirm Spike's convictions and sentences.

Affirmed.


SILBERMAN, J., Concurs.
SLEET, J., Dissents with opinion.

SLEET, Judge, Dissenting.

I respectfully disagree with the majority's conclusion that the detective's testimony did not "reasonably imply a prior bad act by" Spike and that its admission was harmless error. Because the State's question elicited a response from the detective that he knew Spike from his police work in Spike's neighborhood, it undeniably implicated Spike in prior collateral criminal activity. Because the admission of prior bad acts was not harmless error in this case, I would reverse and remand for a new trial.

First, there is no doubt that when a police officer identifies a defendant at trial based on past contact, the officer's testimony creates a prejudicial inference that the defendant has been involved in prior criminal conduct. Day v. State, 105 So. 3d 1284, 1288 (Fla. 2d DCA 2013) (concluding that the officer's testimony that she knew Day "from when she had worked in [her] neighborhood as a community police officer" made it "inconceivable that the jury would not have concluded that Day had been involved in prior criminal conduct, and thus the admission of this evidence constituted reversible error"); Alcantar v. State, 987 So. 2d 822, 825 (Fla. 2d DCA 2008) ("[T]he trial court's decision[] to admit into evidence the irrelevant and prejudicial testimony that the second officer knew Mr. Alcantar from his long experience in law enforcement . . . [was] in contravention to the rules of evidence and an abuse of discretion."); see also State v. Price, 701 So. 2d 1204, 1206-07 (Fla. 3d DCA 1997) (concluding that a new trial was appropriate when a police officer testified that he knew Price from his previous work in the community); Willis v. State, 669 So. 2d 1090, 1093 (Fla. 3d DCA 1996) (holding that the defendant "was unduly prejudiced by the police officer's gratuitous testimony that Willis had previous contacts with the police in other 'incidents' " (citing Hardie v. State, 513 So. 2d 791, 792 (Fla. 4th DCA 1987))). The majority's holding that "a police officer

- 11 -

being 'familiar with' a resident of an area where the officer works does not, by itself, reasonably imply a prior bad act by that person" is contrary to this well-established case law.

Although the State may avoid the prejudicial inference of collateral crimes by concealing the officer's occupation from the jury or may rebut the inference by providing an innocuous explanation for the officer's familiarity with the defendant, neither was done in this case. See Day, 105 So. 3d at 1287-88; Price, 701 So. 2d at 1206 (explaining that a police officer may properly provide identification testimony when his occupation is not disclosed to the jury); Edwards v. State, 583 So. 2d 740, 741 (Fla. 1st DCA 1991) (reversing for a new trial when a police officer testified that he recognized the defendant on a surveillance tape and noting that the testimony would have been admissible had the State laid the proper predicate and "*if* [the officer] were not identified to the jury as a police officer"); Hardie, 513 So. 2d at 792 (concluding that the defendant "suffered prejudice as a result of the witnesses being identified as police officers and then testifying concerning his identity because it created the impression that he had been involved in other criminal activities or had a prior record"). Here, instead of rebutting the prejudicial inference, the detective's responses to the State's questions only reinforced that his basis for knowing Spike was entirely through his official work as a police officer. The State was unable to dispel the reasonable inference that the detective's familiarity with Spike was a result of prior collateral criminal conduct; the detective could not truthfully testify that he knew Spike through a prior inculpable interaction. By granting the State's request to make further inquiry, the trial court only exacerbated the error.

- 12 -

The majority attempts to distinguish Day, Alcantar, Price, Willis, Edwards, and Hardie as involving testimony from officers who were not involved in the underlying case, testimony that was "far more indicative of prior bad acts" than the detective's testimony in this case, and "other errors unrelated to testimony by police officers." I respectfully disagree. The level of an officer's involvement in the underlying case is immaterial to whether his or her identification testimony based on a personal familiarity with the defendant creates a prejudicial inference in the minds of the jurors. See Edwards, 583 So. 2d at 741 (noting that the admission of officer identification testimony required a proper "predicate showing that [the officer] had prior knowledge of or a special familiarity with [the defendant]" but concluding that in any event identification testimony from an officer was admissible only if the officer's occupation was not disclosed). Moreover, my review of the record reveals that the State's sole purpose for calling the detective to the stand was to identify Spike based on his prior police work.[3] Rather than accepting the detective's testimony that he knew Spike, the State intentionally pressed forward, asking specifically whether the detective had met Spike before. As explained above, this court in Day and Alcantar and the Third District in Price considered identification testimony indistinguishable from the detective's testimony in this case and concluded that the error was not harmless. See Day, 105 So. 3d at 1288; Alcantar, 987 So. 2d at 825; Price, 701 So. 2d at 1206-07. The Florida Supreme

---

[3]The majority claims that the detective played a greater role in the execution of the warrant because he "participated in . . . opening a safe containing drugs . . . and collecting, marking, and testing the evidence seized pursuant to the search warrant." However, the State did not ask the detective any questions regarding these activities at the scene; the only reference to the detective's role in the investigation beyond securing the perimeter and locating Spike came from the testimony of two other officers who testified at trial regarding the contents of the safe and Spike's statements to law enforcement.

- 13 -

Court has expressly approved of this court's reasoning in <u>Day</u>, concluding that "permitting questions that elicit a witness's position as a police officer when that witness is identifying a defendant's voice or image has been held to be reversible error even when the identification itself was permissible." <u>Evans v. State</u>, 177 So. 3d 1219, 1230 (Fla. 2015). In <u>Willis</u> and <u>Hardie</u>, the testifying officers also referred to prior "incidents" or "investigations" involving the defendant, which certainly more clearly implicated prior criminal conduct than the testimony in this case. However, I agree with the <u>Price</u> court's reasoning that even though a detective's testimony that he or she is familiar with the defendant from working in the community is less prejudicial than if the officer had expressly referred to prior incidents, it is nevertheless not harmless error. 701 So. 2d at 1207.

The majority's harmless error analysis rests on its assertion that the evidence against Spike "included his own admissions to prior criminal activity." However, Spike's statements to police were only relevant to the offenses charged in the present case; his statements were specifically directed to the illicit substances found in the safe and did not implicate Spike in any uncharged criminal conduct. Nor did Spike take the stand, and therefore the State was unable to impeach him with any past felonies. The only reference to Spike's past criminal history in this case was the deputy's statement that he was familiar with Spike as a result of his police work in Spike's community.[4] This statement created an inference that Spike had been involved in collateral crimes, and "[t]he harmless error test . . . places the burden on the state . . .

---

[4]Although the majority includes several quotations in its statement of the facts regarding Spike's statements to police, these quotations are from a police officer who testified to Spike's post-<u>Miranda</u> statements. Spike did not testify at trial and the recording of his interview with police after his arrest was lost before trial.

- 14 -

to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986).

Additionally, the majority reasons that the testimony was harmless because it was not a feature of the trial. However, the "[e]rroneous admission of collateral crimes evidence is presumptively harmful." Czubak v. State, 570 So. 2d 925, 928 (Fla. 1990); see also State v. Vazquez, 419 So. 2d 1088, 1090 (Fla. 1982) ("[E]vidence of any crime committed by a defendant, other than the crime or crimes for which the defendant is on trial, is inadmissible in a criminal case where its sole relevancy is to attack the character of the defendant or to show the defendant's propensity to commit crime." (quoting Vazquez v. State, 405 So. 2d 177, 179 (Fla. 3d DCA 1981))). And "[e]vidence that suggests a defendant has committed other crimes or bad acts can have a powerful effect on the results at trial." Rodriguez v. State, 112 So. 3d 744, 745 (Fla. 5th DCA 2013) (quoting Bozeman v. State, 698 So. 2d 629, 631 (Fla. 4th DCA 1997)). The State emphasized the detective's employment and elicited testimony that he recognized Spike from his police work in the community where Spike lived. Although the detective did not testify that Spike had committed prior offenses, his "testimony [gave] rise to at least a reasonable implication that [Spike] had previously been involved in criminal activity, and therefore the admission of this testimony was not harmless beyond a reasonable doubt." Day, 105 So. 3d at 1288. As this court explained in Day, there may be

> circumstances under which the fact of a police officer's employment might be harmless. For instance, if [the officer] had testified that she was a police officer, she had lived next door to [the defendant] for several years, and she knew [the defendant] as her neighbor from the neighborhood, [the

- 15 -

officer]'s status as a police officer would be simply an incidental fact that would not necessarily give rise to an implication of prior criminal conduct. But such is not the case here.

Id. (footnote omitted).

Finally, the majority's reliance on the weight of the State's evidence and the credibility of Spike's statements to police misapprehends the harmless error test and goes beyond a "close examination" of the evidence presented at trial. As the Florida Supreme Court has explained, the harmless error

> test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, *or even an overwhelming evidence test.* Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.

DiGuilio, 491 So. 2d at 1139 (emphasis added); see also Cardenas v. State, 867 So. 2d 384, 395 (Fla. 2004) (rejecting this court's holding in McBride v. State, 816 So. 2d 656 (Fla. 2d DCA 2002), that overwhelming evidence against the defendant rendered an error harmless). The weight and credibility of the State's evidence is not relevant to a determination of whether the error affected the verdict. And this court may not reweigh the evidence on appeal. Rivera v. State, 180 So. 3d 1195, 1198 (Fla. 2d DCA 2015) ("[T]he harmless error test does not allow the appellate court to weigh the evidence and substitute itself for the jury.").

Here, the jury was left with the inescapable inference that Spike had been involved in prior criminal activity. Because I do not believe that we can conclude

beyond a reasonable doubt that the erroneous testimony did not impact the verdict, I would reverse and remand for a new trial.